UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROBERT EARLE JOHNSON,

    Plaintiff,

 v.

SARAH KARIKO, *et al.*,

    Defendants.

CASE NO. 3:20-cv-05514-BHS-JRC

REPORT AND RECOMMENDATION

NOTED FOR: July 1, 2022

   The District Court has referred this 42 U.S.C. § 1983 civil rights action to Chief United States Magistrate Judge J. Richard Creatura, pursuant to 28 U.S.C. § 636(b).

   Plaintiff, who is incarcerated in the Coyote Ridge Corrections Center ("CRCC"), brings suit under 42 U.S.C. § 1983 and alleges that various Department of Corrections ("DOC") staff and officials violated his constitutional rights.  Plaintiff is 73 years old and suffers from a variety of medical conditions; he claims that a former DOC secretary, defendant Stephen Sinclair, was deliberately indifferent to the risk to plaintiff of contracting COVID-19.  He also claims that various defendants were deliberately indifferent to his medical needs in their roles related to the DOC's Care Review Committee's ("CRC") delay in approving his knee replacement surgery and

1    that certain mailroom staff violated the First and Fourteenth Amendments by arbitrarily

2    overcharging him for mailing an envelope.

3            Defendants have moved for summary judgment, and the District Court should grant their

4    motion and dismiss all of plaintiff's claims with prejudice.  Plaintiff has failed to come forward

5    with evidence that defendant Sinclair knew of and disregarded the risk of COVID-19 for

6    prisoners in DOC custody, including high-risk prisoners, such as plaintiff.  He has not come

7    forward with evidence from which a reasonable trier of fact could conclude that the delay in

8    providing his knee replacement surgery was unconstitutional and has at most, shown a difference

9    of medical opinion regarding the surgery.  Finally, he fails to show that mailroom staff

10   unreasonable charged him for mailing his envelope where his own evidence shows that

11   mailroom staff followed postal service pricing guidelines.

12                                    **BACKGROUND**

13   **I. Allegations of the Complaint**

14           Plaintiff brings suit against DOC officials Sara Kariko, Frank Longano, and Stephen

15   Sinclair; CRC members ARNP Pamely Saari and PA-C Sarah Landis; and CRCC staff PA-C

16   Jonathan Neau, corrections officer John Turner, and Rebeccer Hoffarth.  *See* Dkt. 5, at 4–5.

17           Plaintiff brings a claim related to DOC's handling of COVID-19 against only defendant

18   Sinclair.  Plaintiff alleges that CRCC staff have not complied with masking and social distancing

19   directives and that his risk of contracting COVID-19 at CRCC as a particularly vulnerable person

20   violates the Eighth Amendment.  *See* Dkt. 5, at 10–12.  He seeks immediate release from custody

21   and damages.  Dkt. 5, at 12, 32.  He also alleges inadequate medical care for his knee condition,

22   which began in June 2015, claiming that the CRC has refused to provide him with a knee

23   replacement and to provide adequate medical care, causing injuries including two pelvic

24

1    fractures in 2019.  Dkt. 5, at 16, 19.  Plaintiff brings this claim against defendants Kariko,

2    Longano, Saari, Near, and Landis and seeks an order to provide him with a knee replacement, an

3    injunction barring defendants from denying him necessary medical care without reasonable

4    justification, and damages.  Dkt. 5, at 33–34.   Finally, plaintiff alleges that defendants have

5    violated the First Amendment and discriminated against him in violation of the Fourteenth

6    Amendment by overcharging him to mail a 9-inch by 12-inch envelope weighing 0.8 ounces.

7    Dkt. 5, at 18.  He brings claims for damages against defendants Turner and Hoffarth.  Dkt. 5, at

8    34.

9        Plaintiff's complaint is signed under penalty of perjury, and the Court considers his

10    contentions in his complaint and other documents signed under penalty of perjury as evidence in

11    opposition to summary judgment, to the extent that plaintiff makes contentions based on personal

12    knowledge and setting forth facts that would be admissible in evidence.  *See Jones v. Blanas*,

13    393 F.3d 918, 923 (9th Cir. 2004).

14    **II.  Summary Judgment Motion**

15        Defendants seek summary judgment dismissal of all of plaintiff's claims.  *See* Dkt. 81.

16    They rely on declarations filed by Scott Russell (describing DOC's response to the COVID-19

17    pandemic), defendant Neau (describing plaintiff's medical care related to his knee), defendant

18    Turner (related to the pricing of plaintiff's mail), and Jordan McKinney (related to plaintiff's

19    grievance history).  *See* Dkts. 82–85.  Defendants filed a notice of dispositive motion informing

20    plaintiff that summary judgment could result in dismissal of his claims without a trial or

21    evidentiary hearing.  Dkt. 86.

22

23

24

1    Plaintiff has filed an opposition, including various documents and evidence in response to

2    defendants' contentions.  *See* Dkts. 103–04.  The parties' evidence is discussed in detail with the

3    analysis of plaintiff's claims, below.

**DISCUSSION**

4

**I.  Legal Standard**

5

6    "The court shall grant summary judgment if the movant shows that there is no genuine

7    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

8    R. Civ. P. 56(a).  When ruling on a summary judgment motion, the Court must take the evidence

9    in the light most favorable to the nonmoving party and must draw all reasonable inferences in

10    that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Conclusory

11    allegations and mere speculation are not enough to create a genuine issue of material fact.  *See,*

12    *e.g.*, *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Finally,

13    the Court may not engage in credibility determinations or weighing of the evidence when ruling

14    on a summary judgment motion.  *See Anderson*, 477 U.S. at 255.

15    Because plaintiff is pro se, the Court liberally construes the pleadings and affords

16    plaintiff the benefit of any doubt.  *See Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985).

17    **II.  COVID-19 Related Claims**

18    Defendants argue that plaintiff has failed to come forward with evidence that would

19    establish that defendant Sinclair—the only defendant against whom plaintiff brings his COVID-

20    19-related claims—was deliberately indifferent toward plaintiff.  Dkt. 81, at 12.  The Court

21    agrees, for the reasons discussed below.

22    ///

23

24

## A. Eighth Amendment Legal Standard

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citation and quotation marks omitted).  Prison officials "must provide humane conditions of confinement; [they] must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates[.]" *Id.* (internal citation and quotation marks omitted).

Two requirements must be met to prevail on such a claim of violation of the Eighth Amendment.  "First, the deprivation alleged must be, objectively, sufficiently serious." *Id.* at 834 (internal citation and quotation marks omitted).  "[A] prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities[.]  For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (internal citation and quotation marks omitted).  The Court assumes without deciding that the alleged harm of contracting COVID-19 is "sufficiently serious" to implicate the Eighth Amendment and instead focuses on the second requirement of deliberate indifference.

"The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Id.* (internal citation and quotation marks omitted).  "[A] prison official must have a 'sufficiently culpable state of mind.'. . .  In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety[.]" *Id.* (internal citations omitted).  This means that the official must "know[] that [the prisoner] face[s] a substantial risk of serious harm and disregard[] that risk by failing to take reasonable measures to abate it." *Id.* at 847.

**B. Defendants' Evidence**

Regarding the issue of deliberate indifference, defendants primarily rely on a declaration from Scott Russell, an official in the Health Services Division of DOC, which sets forth their account of DOC's COVID-19 response. *See* Dkt. 84. This response included DOC's opening an emergency operations center in February 2020, establishing pandemic plans and points of contact, developing protocols and guidelines for dealing with COVID-19 in prisons, and establishing regional care facilities. *See* Dkt. 84, at 3–4, 10. In addition, DOC took measures to mitigate entry of COVID-19 into facilities, including suspending visitation until recently, suspending volunteer programs, screening staff, engaging in contact mapping for staff and prisoners who have close contact with staff who test positive, screening new intakes with health status questions and temperature checks, quarantining incoming individuals at the Washington Corrections Center, and giving temperature checks before transferring prisoners between facilities. Dkt. 84, at 4–5, 16–17. Prisoners who fail the screening process are placed in an isolated area, and the Chief Medical Officer must approve transfers of anyone who has or is suspected of having COVID-19. Dkt. 84, at 5. Further, DOC has decreased prisoner movement and the incoming population and requires staff transporting prisoners to wear protective equipment and sanitize transportation vehicles and restraints. Dkt. 84, at 5–6; *see also* Dkt. 84, at 11–12 (setting forth Governor Inslee's and the DOC's actions to reduce the prisoner population). Russell states that DOC has also substantially complied with CDC guidance for corrections facilities. Dkt. 84, at 12.

In addition, according to Russell, DOC has required staff and prisoners to wear face coverings since April 2020, including requiring prisoners to wear surgical masks outside their cells, bunks, or assigned rooms in an open dorm setting, and has an "intensive cleaning protocol"

1  for certain areas.  Dkt. 84, at 6–7.  Russell also states that DOC "encourage[s]" maintaining

2  social distancing and has reduced capacities for certain activities and programming.  *See* Dkt. 84,

3  at 7.  DOC has also provided soap and access to handwashing supplies, as well as providing hand

4  sanitizer under staff supervision.  *See* Dkt. 84, at 7–8.

5      Russell also states that since October 2020, all DOC facilities have engaged in weekly

6  testing of prison staff and contact tracing when outbreaks are identified.  *See* Dkt. 84, at 8.

7  Infected prisoners are quarantined, and serial testing occurs until all quarantined prisoners have

8  two consecutive negative test results.  Dkt. 84, at 9.  DOC also has procedures for testing and

9  isolating prisoners who have COVID-19 symptoms and their close contacts.  *See* Dkt. 84, at 9–

10  10.   In addition, DOC has vaccinated staff and prisoners in accordance with a phased

11  vaccination plan, including, by April 2021, informing prisoners that any prisoner who wished

12  could receive the vaccine.  Dkt. 84, at 16.  Since August 2021, any staff member who has in-

13  person interactions with prisoners must be fully vaccinated.  Dkt. 84, at 16.

14      Regarding high-risk individuals, Russell states that DOC developed "preventative

15  measures for high risk individuals housed in certain areas[.]"  Dkt. 84, at 3.  In addition, DOC

16  implemented a Rapid Reentry program—allowing for community confinement—that included

17  higher risk individuals.  Dkt. 84, at 12.

18      According to Russell, although some programming has resumed, DOC continues to

19  require masking, social distancing, and serial testing.  Dkt. 84, at 17.

20      **C.  Plaintiff's Evidence**

21      For his part, plaintiff asserts that CRCC failed to implement measures including social

22  distancing, proper mask wearing, and increased sanitation, leading plaintiff to write to defendant

23  Sinclair for help.  Dkt. 103, at 3, 8–9.  In contrast with defendants' evidence describing DOC's

24

1    response to COVID-19, plaintiff paints a bleak picture of the conditions at CRCC, including that,

2    for instance, CRCC staff refused to provide him a mask and actually *decreased* cell cleanings.

3    Dkt. 103, at 4.  He asserts that CRCC failed to quarantine exposed, asymptomatic prisoners, such

4    as his own cellmates after plaintiff contracted COVID-19.  Dkt. 103, at 18.

5         Plaintiff also disputes certain aspects of Russell's declaration, such as that that high-risk

6    individuals were provided with any particular special housing.  Dkt. 103, at 13.  Plaintiff asserts

7    that in fact, the DOC did not take measures to transfer high risk prisoners to special units or

8    separate areas and that at CRCC, the most vulnerable population has always been mixed with all

9    other prisoners, including those who test positive.  Dkt. 103, at 14–15.  Plaintiff asserts that in

10   contrast to Russell's claim of increased sanitization, cleaning was inconsistent and did not begin

11   in March 2020 at the CRCC.  Dkt. 103, at 15.  And, according to plaintiff, CRCC did not

12   implement social distancing in the dining room or pill lines and failed to provide hand sanitizer

13   in at least one day room.  Dkt. 103, at 16.  CRCC also required prisoners to purchase soap, rather

14   than providing it for free.  Dkt. 103, at 26.

15        Plaintiff wrote to defendant Sinclair twice, but he asserts that DOC failed to provide

16   relief for these conditions in response to the letters.  *See* Dkt. 103, at 4.  Plaintiff states that he

17   subsequently contracted COVID-19 twice.  Dkt. 103, at 13, 19.  He also asserts that he wrote to

18   Governor Inslee and the new DOC secretary, asserting his concerns, but that they did nothing to

19   help him.  Dkt. 103, at 20.  Plaintiff later filed grievances about staff not wearing masks and

20   failing to enforce DOC COVID-19 protocol.  Dkt. 103, at 20–21.

21        **D.  Discussion**

22        Plaintiff's theory of liability centers on the allegation that defendant Sinclair was

23   deliberately indifferent to high-risk individuals such as plaintiff.  *See, e.g.*, Dkt. 103, at 22.

24

1   There is clearly a disconnect between what defendant Sinclair presents as the policies put in

2   place to deal with the COVID-19 health emergency and what plaintiff claims was actually

3   occurring at CRCC.  Despite these conflicts in the evidence, however, plaintiff has failed to

4   present evidence that defendant Sinclair was deliberately indifferent.  Deliberate indifference

5   presents a high bar for plaintiffs to clear.  *See Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th

6   Cir. 2016).  It is not enough to show that defendant Sinclair was negligent or that DOC overall,

7   could have done better responding to the COVID-19 pandemic.  *See Farmer*, 511 U.S. at 835.

8   Nor can plaintiff prevail on generalized allegations, as the inquiry into deliberate indifference

9   must focus on individual defendants' subjective states of mind.  *See id.* at 834.  Indeed, where, as

10  here, a plaintiff seeks damages, the Ninth Circuit has explained that the inquiry into deliberate

11  indifference is "refined" and takes a "very individualized" approach.  *Leer v. Murphy*, 844 F.2d

12  628, 633 (9th Cir. 1988).

13      Here, it is undisputed that defendant Sinclair and DOC did take action to respond to the

14  COVID-19 pandemic.  "[P]rison officials who actually knew of a substantial risk to inmate

15  health or safety may be found free from liability if they responded reasonably to the risk, even if

16  the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844.  Plaintiff has failed to come

17  forward with evidence that, taken as true, shows that defendant Sinclair acted unreasonably in

18  responding to the risk of COVID-19 to prisoners, including those at high-risk.  *Accord Cole v.*

19  *Sinclair*, No. 321CV05089RSMBAT, 2021 WL 5889377, at *6 (W.D. Wash. Nov. 8, 2021)

20  (granting a summary judgment motion brought by defendants including defendant Sinclair,

21  relying on a declaration from Russell, and finding that DOC had not been deliberately indifferent

22  to the risk of contracting COVID-19 in prisons), *report and recommendation adopted*,  2021 WL

23  5882016 (Dec. 13, 2021).

24

1    As noted above, DOC has come forward with evidence that it engaged in a detailed,

2    comprehensive, and evolving response to the COVID-19 pandemic.  Russell's declaration sets

3    forth DOC guidelines for wearing masks, cleaning areas, reducing prisoner gatherings, providing

4    cleaning supplies, testing prison staff, quarantining and testing prisoners, and vaccinating staff

5    and prisoners.  *See generally* Dkt. 84.  Russell also states that regarding high-risk individuals,

6    DOC developed preventative measures for individuals in certain areas and implemented a rapid

7    reentry program.  *See* Dkt. 84, at 3, 12.

8    The fact that defendant Sinclair's policies may not have been followed consistently does

9    not mean that defendant Sinclair was deliberately indifferent.  Rather, plaintiff must present

10    evidence that the policies themselves or the promulgation thereof demonstrated deliberate

11    indifference.  In this regard, plaintiff asserts that DOC's response was inadequate because DOC

12    tested only symptomatic prisoners (Dkt. 103, at 4); did not provide N95 masks (Dkt. 103, at 5);

13    and relied on taking temperatures and screening staff, which are not accurate indicators of

14    COVID-19 infection.  Dkt. 103, at 26.  Even taking this evidence as true, however, it does not

15    establish a violation of the Eighth Amendment.  *Accord Maney v. Brown*, 464 F. Supp. 3d 1191,

16    1213 (D. Or. 2020) (where plaintiff alleged that in March 2020 "nobody is getting temperature

17    checks," finding that policy of testing only symptomatic inmates did not rise to level

18    of deliberate indifference); *Wragg v. Ortiz*, 462 F. Supp. 3d 476, 506 (D.N.J. 2020) (finding that

19    where a "prison only tests those inmates who exhibit symptoms and are then determined eligible

20    for testing by medical staff[,]" officials were not deliberately indifferent); *Toney v. Gelardo*, No.

21    21-CV-02428-LTB-GPG, 2022 WL 341169, at *3 (D. Colo. Jan. 3, 2022) ("[L]ack

22    of N95 masks alone does not demonstrate that Defendants disregarded the risk of Covid-19. . . .

23    Plaintiff does not assert that no masks were provided at all, but rather that a specific type of

24

1   masks—an N95 mask—was not provided.  The CDC has stated that wearing cloth face masks for

2   inmates is sufficient to help limit the transmission of Covid-19 in correctional and detention

3   facilities."), *report and recommendation adopted*, 2022 WL 341170 (Jan. 26, 2022); *Kesling v.*

4   *Tewalt*, 476 F. Supp. 3d 1077, 1087 (D. Idaho 2020) (rejecting claims that prison's response was

5   inadequate because, among other things, the response included temperature checks and

6   questionnaires).  It should be noted that dealing with this *novel* virus necessarily means that the

7   DOC's response evolved as the CDC and the DOC gained greater knowledge of what was

8   effective in preventing transmission.  Therefore, in order to prove that defendant Sinclair was

9   deliberately indifferent, plaintiff would need to present evidence tailored toward what Sinclair

10  knew at the time he took action and what options were available to the DOC.  Plaintiff has failed

11  to do so, leading to the uncontroverted conclusion that defendant Sinclair was not deliberately

12  indifferent to at-risk individuals such as plaintiff.

13       For instance, plaintiff himself acknowledges that social distancing in a prison is

14  impossible.  *E.g.*, Dkt. 104, at 6.  Plaintiff also takes issue with the failure to use air filtration in

15  units (Dkt. 103, at 19), but his evidence includes a letter from the CRCC superintendent stating

16  that air filters were used in units where COVID-19 cases were identified but not otherwise due to

17  a lack of filters and concerns about tampering.  *See* Dkt. 104, at 196.  This evidence does not

18  show an unreasonable disregard of the danger of contracting COVID-19 but attempts to work

19  within the confines of the options that were available.

20       Inasmuch as plaintiff argues that the failure to release all vulnerable persons was

21  unreasonable (*see* Dkt. 103, at 5), the Court does not agree.  *See, e.g.*, *Wilson v. Williams*, 961

22  F.3d 829, 844 (6th Cir. 2020) (rejecting an argument that methods of release should have been

23  used to protect vulnerable prisoners because prison officials are not required to take "every

24

1    possible step to address a serious risk of harm" and because a court must take into account

2    constraints on the authority to release prisoners). In light of other preventative measures taken

3    by DOC, the Court does not agree with plaintiff that release of all vulnerable prisoners was the

4    only reasonable response to the pandemic.

5          Plaintiff also points to evidence that defendants did not provide separate housing for

6    high-risk individuals. He asserts that there are no particular units housing high risk or most

7    vulnerable prisoners. Dkt. 103, at 6. Of note, however, it is undisputed that DOC has taken

8    other measures that reduced the risk for vulnerable prisoners. Russell states that the Rapid

9    Reentry program "included individuals who meet the CDC guidelines of those at higher risk for

10    health complications from COVID-19." Dkt. 84, at 12. DOC prioritized the vaccination of high-

11    risk prisoners. Dkt. 84, at 15. Moreover, the current DOC guidelines specifically provide that

12    "[h]ousing units with a high concentration of individuals at high risk for severe COVID-19 may

13    be placed on protective separation status" and include special directions for staff and prisoners in

14    units on protective separation status. Dkt. 84-1, at 21; *see also* Dkt. 84-1, at 37 (stating that the

15    protective separation directions were added in May 2020). Finally, although plaintiff makes

16    much of the failure to transfer high risk individuals into separate areas, specifically a unit near

17    CRCC, the evidence that he relies on includes a medical official's statement that she considered

18    doing so but decided that it was not an appropriate approach "based on the location of the facility

19    and proximity to community hospitals." Dkt. 104, at 160. In short, even taking plaintiff's

20    evidence that DOC failed to transfer all the most vulnerable prisoners into special units to protect

21    them, he has not shown that in doing so, DOC unreasonably disregarded the risk to vulnerable

22    prisoners.

23

24

1    Much of plaintiff's evidence focuses on the allegedly inadequate response to COVID-19

2    at the CRCC, including that facility's failure to follow DOC's guidelines.  *See, e.g.*, Dkt. 103, at

3    3 (CRCC's failure to implement social distancing, mask wearing, or increased sanitation); Dkt.

4    103, at 17 (similar); Dkt. 103, at 21 (mingling of prisoners who tested positive for COVID-19

5    with the healthy population); Dkt. 103, at 25 (describing lockdown conditions at CRCC in June

6    2020, when plaintiff was forced to use his wastebasket as a toilet); Dkt. 103, at 26 (CRCC

7    prisoners forced to purchase soap); Dkt. 104, at 38–42, 48–61 (prisoner declarations and

8    statements about conditions at CRCC).  In general, an official such as defendant Sinclair cannot

9    be held liable simply on the basis that he is a supervisor of others who may have failed to follow

10   policies that he attempted to implement.  It is well established that when it comes to imposing

11   liability under § 1983, a supervisor is not automatically liable for the failures of his subordinates.

12   *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Nothing in plaintiff's materials supports that these

13   alleged actions and inactions were taken with the conscious participation of defendant Sinclair.

14   *See also* Dkt. 84 (setting forth DOC requirements for mask wearing, sanitation, and quarantining

15   positive-testing prisoners as well as attempts to reduce prison population and encouragement of

16   social distancing).  Plaintiff provides an Office of the Corrections Ombuds Report regarding the

17   mid-2020 COVID-19 outbreak at CRCC, but nothing in the Report indicates that defendant

18   Sinclair intentionally disregarded the risk of COVID-19 and thereby contributed to the outbreak.

19    Plaintiff has not shown that defendant Sinclair ignored or approved the alleged lapses in

20   enforcement of guidelines, so that these alleged lapses "do little to establish that the [defendant

21   was] deliberately indifferent."  *Swain v. Junior*, 958 F.3d 1081, 1089 (11th Cir. 2020).  Plaintiff

22   has not come forward with evidence that could support that defendant Sinclair subjectively

23   believed that the measures DOC took were inadequate to protect high-risk individuals.  *See*

24

1  *Swain*, 958 F.3d at 1089 (noting that a claim of deliberate indifference was unlikely to succeed

2  where there was no cited evidence that defendants subjectively believed the measures they were

3  taking were inadequate); *see also Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020)

4  ("Although the district court might do things differently, mere 'disagreement' with . . . medical

5  decisions does not establish deliberate indifference.").

6        The Court is sympathetic to plaintiff's condition and to the validity of his concerns about

7  conditions of confinement during COVID-19.  But plaintiff has brought his claims against

8  defendant Sinclair, and he has not introduced evidence from which a finder of fact could

9  conclude that defendant Sinclair acted with deliberate indifference.  *See also Maney*, 2020 WL

10  2839423, at *3 ("the question is not whether [defendant] can do better, the question is whether

11  [defendant] has acted with indifference to the risks posed by COVID-19.").

12        The claim against defendant Sinclair related to failure to protect plaintiff from COVID-19

13  should be dismissed with prejudice.

14      **III. Knee Treatment Claims**

15        Defendants next argue that plaintiff's claims against defendants Kariko, Longano, Saari,

16  Near, and Landis related to their role in medical treatment for plaintiff's left knee should be

17  dismissed because plaintiff has not shown more than a difference of opinion regarding his

18  medical care.  Dkt. 81, at 15.  The Court agrees.

19      **A.  Defendants' Evidence**

20        Defendant Neau, a physician's assistant at CRCC and plaintiff's provider since at least

21  December 2018, provides his declaration describing his role in plaintiff's healthcare.  Dkt. 83.

22  Defendant Neau states that he does not believe a knee replacement will resolve plaintiff's knee

23  pain.  *See* Dkt. 83, at 5.

24

1    According to defendant Neau, in December 2018, plaintiff complained of continued

2    issues from his knee "lock[ing]" and causing pain caused by an injury "a few years ago."  Dkt.

3    83, at 1; *see also* Dkt. 83-1, at 2.  Defendant Neau stated that he would seek to have the CRC

4    approve surgical treatment and that plaintiff "likely has a meniscus tear" and that plaintiff's

5    condition had not improved over the last few years.  Dkt. 83, at 2.

6    Defendant Neau provides evidence that following a December 2018 MRI of plaintiff's

7    knee, Neau told plaintiff that they should discuss the results of the MRI before moving forward

8    and that in addition to a meniscus tear, plaintiff had "bad osteoarthritis[,] which surgery won't

9    fix."  Dkt. 83, at 2.  However, defendant Neau stated that he would "put in for the surgery in the

10   mean time."  Dkt. 83-1, at 5.

11   Defendant Neau presented the CRC with plaintiff's case in early 2019, and the CRC

12   voted to recommend a knee brace and deny referral for surgical evaluation, noting that x-ray

13   findings "do not support knee replacement at this time."  Dkt. 83, at 2; Dkt. 83-1, at 7.

14   Defendant Neau's notes from a follow up appointment indicate that the CRC "felt that [plaintiff]

15   had such significant osteoarthritis that meniscus repair was not viable[.]"  Dkt. 83, at 2; *see also*

16   Dkt. 83-1, at 12.  Defendant Neau's notes also state that plaintiff was amenable to the knee brace

17   and an injection, denied new injuries to his leg, and reported that although quite painful, he was

18   able to walk without an assistive device.  Dkt. 83, at 2; Dkt. 83-1, at 12.  Defendant Neau

19   measured plaintiff for a knee brace (which plaintiff was fitted for in May 2019) and administered

20   an injection for joint pain.  Dkt. 83, at 3.

21   On August 3, 2019, plaintiff requested to see defendant Neau on the basis that on July 17,

22   2019, plaintiff's knee had buckled and plaintiff had injured his "right leg groin" when trying to

23   break the fall.  Dkt. 83, at 3; *see also* Dkt. 83-1, at 19.  Plaintiff stated that he was confined to a

24

1    wheelchair as a result.  Dkt. 83, at 3.  Defendant Neau states that he saw plaintiff on August 9,

2    2019, and that plaintiff's "ligaments and muscles of his knee [were] intact and therefore,

3    structurally sound" so that plaintiff's knee itself was not mechanically unstable.  Dkt. 83, at 3.

4    Instead, defendant Neau attributed buckling of the knee to being a reaction to pain when plaintiff

5    placed full weight on his knee.  Dkt. 83, at 3.  Defendant Neau also believed that plaintiff had a

6    "hip flexor strain that should resolve with time" and advised plaintiff to take pain medication.

7    Dkt. 83, at 3.  Plaintiff was prescribed Tylenol and capsaicin cream and allowed to use a cane in

8    response to his complaints of hip pain.  Dkt. 83, at 3–4.

9           In September 2019, at plaintiff's request, defendant Neau again presented a referral to the

10   CRC for orthopedic evaluation of plaintiff's left knee for a knee replacement.  Dkt. 83, at 4.  The

11   CRC denied the referral and recommended obtaining a more recent set of x-rays, since plaintiff's

12   x-rays were too old to meet CRC criteria.  Dkt. 83, at 4; *see also* Dkt 83-1, at 22.

13          Defendant Neau saw plaintiff again in October 2019, and plaintiff reported that his left

14   knee still hurt but the brace was helping a little.  Dkt. 83, at 4; *see also* Dkt. 83-1, at 24.

15   Defendant Neau administered another injection.  Dkt. 83, at 4.  Defendant Neau also ordered x-

16   rays of plaintiff's knee in January 2020.  Dkt. 83, at 4.  Subsequent notes reflect that plaintiff

17   "chose to forgo the x-rays until it could be done on site."  Dkt. 83, at 5; Dkt. 83-1, at 35.

18          In November 2020, after obtaining updated x-rays, defendant Neau again presented

19   plaintiff's request for a knee replacement to the CRC.  Dkt. 83, at 5.

20          Defendants also provide evidence about plaintiff's grievances regarding medical

21   treatment for his knee.  In October 2019, a grievance coordinator responded to plaintiff's

22   grievance about his knee surgery and groin injury by reiterating that the CRC had rejected

23   plaintiff's requests for an orthopedic consult.  Dkt. 82-1, at 2.  Plaintiff could also obtain over the

24

counter medications or could ask his provider for another pain medication prescription or to
discuss physical therapy.  Dkt. 82-1, at 2.  Plaintiff's appeals were also rejected.  *See* Dkt. 82-1,
at 9.

### B.  Plaintiff's Evidence

For his part, plaintiff asserts that the denial of his request for a knee replacement is due
not to a difference in medical opinions, but because the CRC "often disregards prisoner
complain[t]s of chronic and substantial pain" and is doing so in his case, as well.  Dkt. 5, at 16.
He claims that DOC protocol requires CRC approval for his knee replacement but that the CRC
does not examine prisoners or even review their medical records before making a decision on a
request.  *See* Dkt. 5, at 23; *see also* Dkt. 5, at 24 (claiming that CRC decisions are not based on
application of standardized medical criteria or objective clinical protocols).

Plaintiff asserts that in July 2019, he suffered from "pelvic bones fractures" as a result of
failure to treat his injured knee.  Dkt. 5, at 17, 19.  He asserts that he has repeatedly informed his
providers and other DOC officials about his knee, including filing a previous action regarding
the failure to adequately treat his left knee.  *See* Dkt. 5, at 17.  For instance, he claims that he
informed his medical provider in April 2018 that plaintiff's knee was buckling more frequently
and that plaintiff had hurt his foot when he tried to break a fall.  Dkt. 103, at 35.

Plaintiff also provides a letter to Dr. Kariko on November 11, 2019, seeking an individual
evaluation of his left knee to determine whether a knee replacement is possible.  Dkt. 5, at 59.
Dr. Kariko responded by stating that his request was not appropriately directed to her and that
she had would forward plaintiff's letter to CRCC health care staff and request that they readdress
the issue with plaintiff.  Dkt. 5, at 60.

1    Plaintiff states that he wrote "risk management requesting relief and assistance" but that

2    defendant Longano replied to plaintiff "with misinformation about what medical assistance

3    CRCC is providing." Dkt. 5, at 24. Plaintiff attached to his complaint defendant Longano's

4    letter, from February 5, 2020, which states that plaintiff would be receiving a grievance response

5    soon, that his provider was continuing to consider further treatment options, and that plaintiff

6    could exercise his rights under DOC health care policies and the grievance program to address

7    his complaints. Dkt. 5, at 62. Plaintiff replied in a letter stating that he was not being treated for

8    pelvic fractures other than being provided with certain pain medication and that the steroid

9    injections were not helping him. Dkt. 5, at 63.

10    Plaintiff also provides various affidavits from other prisoners who have witnessed him

11    falling or otherwise suffering symptoms of his knee pain. Dkt. 5, at 53–57.

12    **C. Discussion**

13    Plaintiff asserts that defendants have been deliberately indifferent to his knee injury in

14    light of his informing them repeatedly that he has injured himself because of his knee "giving

15    way from knee pain[.]" Dkt. 103, at 2. However, to prevail on a claim related to medical

16    treatment under the Eighth Amendment, plaintiff must do more than show that he has suffered

17    harm as a result of his providers' chosen course of treatment. *See Toguchi v. Chung*, 391 F.3d

18    1051, 1058 (9th Cir. 2004) ("[A] mere 'difference of medical opinion . . . [is] insufficient, as a

19    matter of law, to establish deliberate indifference.'" (Internal citation omitted.)). Instead,

20    plaintiff must show that the course of treatment was medically unacceptable under the

21    circumstances and was chosen in conscious disregard of an excessive risk to plaintiff's health.

22    *Id.* Here, there is an explanation for the failure to pursue a total knee replacement—plaintiff's

23    provider and the CRC believed based on the MRI results that plaintiff's osteoarthritis meant that

24

1    a knee replacement would not realistically solve the issue or that updated x-rays were necessary

2    before providing knee surgery.

3        Although not addressed by defendants, it appears from plaintiff's evidence that he did,

4    indeed, eventually receive his knee replacement surgery, in March 2021. *See* Dkt. 104, at 307.

5    Plaintiff has not provided evidence of whether the CRC authorized the knee replacement or how

6    he ultimately was able to undergo the procedure. Even assuming that the CRC ultimately

7    reversed course, plaintiff's evidence does not show that the delay in providing the surgery

8    violated the Eighth Amendment. Plaintiff's evidence is not that officials ignored his complaints,

9    providing minimal treatment that they knew to be ineffective. *Cf. Stewart v. Aranas*, 32 F.4th

10   1192, 1195 (9th Cir. 2022) (deliberate indifference for prison officials to ignore worsening

11   symptoms related to an enlarged prostate, providing no more care than examinations and generic

12   medication that was ineffective). Rather, there is no genuine dispute that during the relevant

13   period, plaintiff's MRI results showed osteoarthritis, which Neau believed could not be cured by

14   surgery (*see* Dkt. 83, at 2); that in early 2019, the CRC recommended a knee brace but not

15   surgery in light of his "significant osteoarthritis" (Dkt. 83, at 2); that plaintiff was given a knee

16   brace, Tylenol, capsaicin cream, and injections for his knee pain (Dkt. 83, at 3–4); and that in

17   September 2019, the CRC denied plaintiff's renewed request on the basis of his x-rays being

18   outdated but recommended steroid injections, exercises, and an updated set of x-rays. Dkt. 83, at

19   4. This evidence, even taken in the light most favorable to plaintiff, falls short of establishing

20   deliberate indifference to plaintiff's knee issues.

21       Plaintiff also appears to argue that defendants were deliberately indifferent to him after

22   he suffered pelvic injuries. Dkt. 103, at 28. He claims that defendant Neau "guess[ed]" at

23   plaintiff's diagnosis rather than having x-rays taken and that x-rays later revealed that plaintiff in

24

1   fact had fractures of his pelvis.  Dkt. 103, at 30, 32.  Again, however, even if plaintiff established

2   that defendant Neau was negligent, negligence alone is not enough to prevail on a claim related

3   to inadequate medical care.  *See, e.g.*, *Burgess v. Mar*, 395 F. App'x 368 (9th Cir. 2010)

4   (applying *Toguchi*, 391 F.3d at 1060, to reject claim that misdiagnoses violated the Eighth

5   Amendment).  Defendant Neau states that when he initially believed that the injury was a hip

6   flexor strain, he believed it would "resolve with time."  Dkt. 83, at 3.

7           In addition, plaintiff appears to take issue with the "misleading" assertion that defendant

8   Neau prescribed plaintiff pain medication, capsaicin cream, and a cane after plaintiff's pelvic

9   injury.  Dkt. 103, at 31.  However, defendant Neau does not state that he prescribed these

10  treatments or devices, instead stating his awareness that plaintiff had such prescriptions.  *See*

11  Dkt. 83, at 4.  Defendant Neau states that he advised only that plaintiff take Tylenol because he

12  initially believed that the injury was a hip flexor strain that "should resolve with time."  Dkt. 83,

13  at 3.

14          Plaintiff also alleges various facts related to failure to provide him with an MRI and

15  treatment for his knee in the period leading up to August 2016.  *See* Dkt. 5, at 16.  However,

16  plaintiff previously brought suit related to these allegations (*see* Dkt. 95, *Johnson v. Morgan*,

17  Case No. 3:16-cv-05738-BHS (W.D. Wash. June 6, 2018)), and he explains in the operative

18  complaint in this lawsuit that he circumscribes the claims here to those relevant to failure to

19  authorize the knee replacement.  *See* Dkt. 5, at 16.

20          Moreover, although the Court considers as evidence plaintiff's statements under penalty

21  of perjury to the extent that they are made on personal knowledge, plaintiff fails to provide any

22  evidence to substantiate certain of his claims.  For instance, he claims that CRC ignores prisoner

23  complaints of pain and does not have a medically sound basis for their decisions, but he provides

24

REPORT AND RECOMMENDATION - 20

no factual basis for these statements.  *See* Dkt. 5, at 16, 24; *see also* Dkt. 103, at 28 (asserting

that CRC has a blanket policy of denying care such as he requested).  He asserts that defendant

Neau presented "misinformation," but he does not explain what this misinformation was.  Dkt.

103, at 29.  Plaintiff cannot create a genuine issue of material fact for summary judgment

purposes by relying upon mere speculation  *See Nelson v. Pima Community College*, 83 F.3d

1075, 1081–82 (9th Cir.1996) ("[M]ere . . . speculation[does] not create a factual dispute for

purposes of summary judgment.") (citation omitted).  Accordingly, his claims related to delay in

providing his knee replacement surgery should be dismissed with prejudice.

## IV.  Mail Claims

Defendants argue that plaintiff's claims related to his mail pricing should be dismissed

because they did not overcharge plaintiff for mail and because their actions would not prevent

him from sending mail more cheaply in the future, if he properly addressed the mail.  Dkt. 81, at

17.  The Court agrees that these claims should be dismissed, even taking plaintiff's evidence as

true.

Defendants rely on defendant Turner's declaration stating that he understands that if a

large, rectangular envelope is addressed parallel to the shorter side, it must be mailed as a

package, at a higher postage rate.  *See* Dkt. 85, at 2 ("[T]he mail must be a rectangle in a

horizontal shape, so that it is machinable.").  He bases his understanding on his interpretation of

a postal service template and instructions from the local postmaster.  Dkt. 85, at 2.

For his part, plaintiff asserts that the mail that he sent was 9-inches by 12-inches and that

he may address a 9-inch by 12-inch envelope parallel to the shorter side without having to pay

the package rate.  He bases this off of portions of the Postal Service's domestic mail manual that

he attaches as evidence to his response to the summary judgment motion.  *See* Dkt. 104, at 311–

22.  But the attachments do not support his arguments.  One document that plaintiff relies on shows that the "length" of the envelope *cannot be less than 11 ½ inches*.  Dkt. 104, at 311.  This supports defendants' claim that plaintiff's envelope had to be addressed parallel to the long side, so that the envelope was more than 11 ½ inches long, as addressed.  Similarly, another document that plaintiff provides specifically states that the "length" of a flat envelope is the side parallel to the address as read and that the minimum length is 11 ½ inches—which supports that a 9-inch by 12-inch envelope would need to be addressed parallel to the 12-inch side.  Dkt. 104, at 313.  Finally, plaintiff includes what appears to be a printout about the elements of the face of a piece of mail, but this, too, states that "the placement of the address may render a piece nonmailable or nonmachinable[.]"  Dkt. 104, at 318.  Other evidence that plaintiff refers to references non-First Class mail and does not support his claims.  *See* Dkt. 104, at 319–20 (discussing standards for "enveloped, polywrapped, or card-type Periodicals. . . , USPS Marketing Mail, Bound Printer Matter, Media Mail, and Library Mail flat-size pieces mailed at presorted, automation, or carrier route prices" and "bound or folded . . . , Periodicals, USPS Marketing Mail, Bound Printer Matter, Media Mail, and Library Mail flat-size pieces mailed at presorted, automation, or carrier route prices not in envelope or polywrap").

Thus, plaintiff fails to create a genuine issue of material fact that defendant Turner was applying mail standards as defendant Turner reasonably understands them, to require plaintiff's envelope to be addressed parallel to the long side of the envelope.  Moreover, plaintiff does not explain why he could not simply address the envelope as instructed by the mailroom to avoid paying the higher postage prices.  Plaintiff provides examples of other envelopes he mailed for the cheaper rate, but he does not explain how he addressed those envelopes.  *See* Dkt. 5, at 25.  And even if the CRCC mailroom updated or changed its understanding of Postal Service

1    requirements, he does not explain why this would render CRCC's rejection of his envelope in

2    March 2020 unconstitutional.

3        Regulations impinging sending outgoing mail to non-prisoners are governed by the

4    standard set forth in *Procunier v. Martinez*, 416 U.S. 396 (1974), *overruled on other grounds by*

5    *Thornburgh v. Abbott*, 490 U.S. 401 (1989).  "Under these standards, censorship of prisoner mail

6    is justified only if 'the regulation or practice in question [ ] further[s] an important or substantial

7    governmental interest unrelated to the suppression of expression' and 'the limitation of First

8    Amendment freedoms [is] no greater than is necessary or essential to the protection of the

9    particular governmental interest involved.'"  *Barrett v. Belleque*, 544 F.3d 1060, 1062 (9th Cir.

10   2008).  Here, there is no genuine dispute that following U.S. postal service guidelines for pricing

11   mail is an important government interest unrelated to the suppression of expression and that the

12   limitation is no greater than necessary—particularly where plaintiff is not barred from sending

13   any particular mail but is challenging a price difference between two parcel pricing methods.

14       The Court observes that although plaintiff asserts that his envelope was 9-inches by 12-

15   inches, certain of defendants' evidence indicates that the envelope was, in fact, a larger, 9-inch

16   by 13-inch envelope.  *See* Dkt. 82-1, at 12.  The Court takes as true plaintiff's claim that the

17   envelope was 9-inches by 12-inches.  Nevertheless, plaintiff's claims fail because, as noted

18   above, he has not created a genuine issue of material fact that the envelope had to be addressed

19   parallel to the long edge.

20       Plaintiff also argues that the pricing of his mail violated equal protection by

21   discriminating against prisoners, who are charged more than non-prisoners.  *See* Dkt. 5, at 31.

22   This argument fails because plaintiff has failed to show that his mail has been priced differently

23   than that of non-prisoners.  Moreover, because prisoners are not a protected class (*Glauner v.*

24

1  *Miller*, 184 F.3d 1053, 1054 (9th Cir.1999)), a difference in treatment would require only a

2  rational basis as justification, and defendant Turner's understanding of how U.S. postal service

3  guidelines requires addressing envelopes clearly has a rationale relationship to the legitimate

4  government interest of not having mail returned.

5       Plaintiff also asserts that the pricing of his mail violated due process, specifically his

6  "right to correspond." Dkt. 5, at 31. Because the First Amendment provides the source of

7  protection for his right to send outgoing mail, his attempt to bring an independent claim of

8  violation of a right to correspond fails. *See United States v. Lanier*, 520 U.S. 259, 272, 117 S.

9  Ct. 1219, 1228, 137 L. Ed. 2d 432 (1997) (If "a constitutional claim is covered by a specific

10  constitutional provision . . . the claim must be analyzed under the standard appropriate to that

11  specific provision, not under the rubric of substantive due process.")

12       Plaintiff's claims related to processing his envelope should be dismissed with prejudice.

13  **CONCLUSION**

14       The undersigned recommends that defendants' motion for summary judgment (Dkt. 81)

15  be granted, that plaintiff's claims be dismissed with prejudice, and that this matter be closed.

16       Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

17  fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

18  6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

19  review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

20  objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

21  *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted).

22  ///

23

24

Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **July 1, 2022,** as noted in the caption.

Dated this 10th day of June, 2022.

J. Richard Creatura
Chief United States Magistrate Judge